1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9                                    | 1:06-cv-01326 OWW SMS

10   GREAT WEST CASUALTY COMPANY,

11            Plaintiff,              | ORDER GRANTING DEFENDANT'S
                                        MOTION FOR SUMMARY JUDGMENT
                                        (DOC. 15), DENYING
12            v.                        DEFENDANT'S MOTION FOR
                                        SUMMARY JUDGMENT PURSUANT TO
13   GENERAL FIRE & CASUALTY COMPANY,  CALIFORNIA INSURANCE CODE §
                                        11580.9(b) (DOC. 38), AND
14                                      DENYING PLAINTIFF'S MOTION
              Defendant.               FOR SUMMARY JUDGMENT (DOC.
15                                      14)

16

17                    I. __INTRODUCTION__

18       This case concerns an insurance coverage dispute between two

19   insurers, Plaintiff Great West Casualty Company ("Great West")

20   and Defendant General Fire & Casualty Company ("GFC"), over their

21   respective share of defense costs and indemnity payments in

22   defending and settling claims against a mutual insured, Juan J.

23   Mendez Cobian ("Mendez"), in an underlying state court action for

24   wrongful death and injuries, *Villalobos, et al., v. Juan Jose

25   Mendez Cobian, et al.*, Fresno County Superior Court, Case No.

26   05CEG03445 MBS ("Underlying Action").  The underlying action

27   involved a motor vehicle accident in which Mendez drove a

28

                                    1

1   Freightliner truck tractor he owned that was pulling a commercial
2   trailer owned by OHK Transport, LLC ("OHK") to pick up cargo at a
3   cotton-ginning facility.  The trailer was provided to Mendez
4   under a written subhaul agreement between OHK and Mendez.  OHK
5   provides transportation services to companies that need to
6   transport cargo and/or commodities, including Western Milling
7   Company, LLC ("Western Milling").  On the day of the accident
8   Mendez was driving to pick up a load of cargo for Western Milling
9   as provided for in the subhaul agreement between Mendez and OHK.
10  Mendez was alleged to have struck a vehicle driven by Maria
11  Aviles and carrying three of her children as passengers, causing
12  the death of Maria Aviles and injuries to her three children.
13  Aviles's survivors and the three minors brought the underlying
14  action, naming as defendants Mendez, OHK and Western Milling.

15      On the day of the accident, Mendez was the named insured
16  under a policy of commercial auto liability insurance issued by
17  Great West.  At the same time GFC had in effect a policy of
18  liability insurance under which OHK and Western Milling, among
19  others, were named insureds.  The trailer Mendez was hauling was
20  specifically scheduled under the GFC policy.  As the operator of
21  this trailer, Mendez also became an additional insured under the
22  GFC policy.

23      Before the court for decision are three motions for summary
24  judgment: first, Defendant's motion for summary judgment pursuant
25  to California Insurance Code section 11580.9(b), and second, the
26  parties' cross-motions for summary judgment.  Defendant GFC seeks
27  summary judgment that under California Insurance Code section
28  11580.9(b) it is conclusively presumed that GFC's coverage is

excess to Great West's coverage because OHK rented or leased a motor vehicle without operator to Mendez.  Plaintiff Great West moves for summary judgment on its claims for declaratory relief and equitable contribution.  It seeks a declaration that the coverage limits of the GFC policy as to Mendez are $15 million, inclusive of defense costs, and seeks judgment in its favor on its equitable contribution claim and a determination that Great West is entitled to reimbursement of the approximate $1 million in defense and indemnity costs it incurred and paid on behalf of Mendez in defending and settling claims against him in the underlying action.  GFC moves for summary judgment on the grounds that Mendez was an undeclared driver under the GFC policy and that the policy contains a $50,000 sub-limit for undeclared drivers.  GFC seeks a declaration that, as applied to Mendez, the GFC policy provides coverage in the amount of $50,000.

## II. <u>FACTUAL BACKGROUND</u>

A.   <u>The Parties</u>.

Plaintiff Great West Casualty Company is incorporated in the State of Nebraska and its principal place of business is in Nebraska.  It is licensed to conduct casualty insurance business in the State of California.  Defendant General Fire & Casualty Company is incorporated in the State of Idaho and its principal place of business is in Idaho.  It is licensed to do insurance business in the State of California.

B.   <u>The Accident</u>.

On December 17, 2004, Juan J. Mendez Cobian was involved in

3

a motor vehicle accident while driving a truck tractor that was hauling a trailer to pick up cargo for Western Milling.  (Doc. 19, Joint Statement of Stipulated Facts In Support Of Reciprocal Motions for Summary Judgment ("JSSF") #5.)  Mendez is an individual doing business as Mendez Trucking.  (JSSF #1.)  He owned the 1996 Freightliner truck tractor that was hauling a trailer owned by OHK ("tractor-trailer").  (JSSF #4.)  At the time of the accident, Mendez was operating the tractor-trailer pursuant to a subhaul agreement between Mendez and OHK entered into on February 25, 2004.  (JSSF ## 4 & 5.)  While driving Mendez collided with an automobile driven by Maria Aviles in Cantua Creek, Fresno County, resulting in the death of Aviles and serious bodily injury to her three children who were passengers in her car.  (Doc. 14 at 2.)

On November 3, 2005, the survivors and minors brought an action against Mendez, OHK, and Western Milling for wrongful death and injuries arising out of the December 17, 2004 accident. *See Jose Jesus Aviles Villalobos, et al., v. Juan Jose Mendez Cobian, et al.*, Fresno County Superior Court, action No. 05CECG03445 MBS.  (JSSF #6.)  In February 2007, an agreement was reached for settlement of all the claims arising out of the accident for the total sum of $2 million.  (JSSF #16.)  Under the settlement agreement, Great West paid the plaintiffs $1 million on behalf of Mendez.  (JSSF #17.)  Also under the terms of the settlement, GFC paid the plaintiffs $1 million on behalf of OHK and Western Milling.  (JSSF #18.)  The present action was preserved under an agreement between Mendez, OHK, Western Milling, Great West and GFC, who have otherwise released and

4

discharged each other from all claims arising out of the accident.  (JSSF #19.)

C.   The Subhaul Agreement.

Mendez and OHK entered into a written subhaul agreement on February 25, 2004.  Plaintiff notes that under the agreement, "OHK was to provide to Mendez one of its licensed over-the-road commercial trailers (it apparently owned well over 100 such trailers), and to give Mendez daily instructions as to where and when to deliver cargo or commodities to destinations throughout Central California."  (Doc. 14 at 2.)  Under the agreement, Mendez was designated an independent contractor.  Mendez was also required to indemnify OHK for all losses arising from operations under the agreement.

D.   The Great West Insurance Policy.

Great West issued a policy of commercial lines liability insurance, policy No. GWP 19641A, to Mendez, an individual doing business as Mendez Trucking.  (JSSF #7.)  The Great West policy provides coverage to Mendez as a named insured with indemnity limits of $1 million per occurrence plus additional coverage for defense costs related to a covered claim.  (Doc. 14 at 3.)  The truck tractor Mendez owns is listed as a scheduled vehicle under the policy.  (JSSF #8.)  The terms of the Great West policy are not in dispute.

Great West defended Mendez in the underlying action, expending $79,675.44.  (JSSF ## 13-14.)  In partial satisfaction of the terms of the settlement, Great West paid $1 million to plaintiffs on behalf of Mendez as its named insured.  (JSSF #17.)

5

1          **E.    The GFC Insurance Policy.**

2          GFC issued a multi-coverage commercial insurance policy,

3   policy No. RM00961-03, which included commercial automobile

4   coverage, to ten named insured business entities including OHK

5   and Western Milling.  (JSSF #9.)  OHK is a California limited

6   liability company, as is Western Milling.  (JSSF ## 2-3.)  The

7   OHK trailer operated by Mendez at the time of the accident is

8   scheduled as an insured vehicle under the GFC policy.  (JSSF

9   #10.)  As an operator of the OHK trailer with permission, Mendez

10  is an additional insured under the GFC policy.  (JSSF #11; Doc.

11  14 at 7.)

12         The maximum liability coverage limits of the GFC policy are

13  $15 million per occurrence.  (Doc. 16 at 6.)  The coverage limit

14  with respect to Mendez, who was not listed in the "Declared

15  Operators or Drivers" section of the policy, is in dispute and is

16  the subject of this action.  (JSSF ##11-12.)

17         GFC defended OHK and Western Milling in the underlying

18  action, expending $142,644.11 in the process.  (JSSF #15.)  It

19  also paid $1 million to the plaintiffs on behalf of OHK and

20  Western Milling in partial satisfaction of the settlement.  (JSSF

21  #18.)  GFC did not participate in the defense of Mendez in the

22  underlying action.  (JSSF #13.)  It has offered to pay $50,000 in

23  combined defense and indemnity coverage to Great West, which it

24  claims is the limit on Mendez's coverage under the GFC policy.

25  (Doc. 24 at 2.)

26         The GFC policy provides wide-ranging coverage, including

27  property loss, business interruption, and legal liability.  It

28  covers over 250 vehicles, over 100 named insureds and additional

                                    **6**

insureds, and various items of real and personal property.

### 1. Extension of Coverage to Permissive Users: Additional Insureds Under the GFC Policy

The GFC policy at issue, policy No. RM00961-03, was in effect from October 10, 2004 to October 10, 2005.  (Doc. 19, Ex. D at GFC 1.)  The Policy Declarations and Schedules make up the first 62 pages of the policy materials and the policy booklet makes up the rest of the total 120 pages.  On the first page of the policy, the "Blanket Legal Liability and Defense Limit" is listed as $15 million in bold-faced type.  On the second page, OHK is listed as a named insured.  Coverage is extended to named insureds on page 63 of the policy materials, which is also the first page of the policy booklet, under the section "INSURED," which appears to be in approximately 14 point font.  (Doc. 19, Ex. D at GFC 63.).  The next section listed, in the same font, is "ADDITIONAL INSURED" (also approximately 14 point font), and in section A under that heading, coverage is extended to "any person operating your vehicles or watercraft with your permission...." (Doc. 19, Ex. D at GFC 63.)  Mendez was driving the OHK trailer at the time of the accident with OHK's express permission, as he was acting within the scope of the subhaul agreement.  The vehicles scheduled in the GFC policy are listed on pages 22 to 27 and include the OHK trailer pulled by Mendez at the time of the accident. (Doc. 19, Ex. D at GFC 22-27.)  As such, section A under "ADDITIONAL INSUREDS" extends coverage to Mendez as a permissive user of a scheduled vehicle under the GFC policy. This is undisputed.

7

## 2. Liability Insuring Agreement

On page 32 of the policy booklet is the section entitled "LEGAL LIABILITY AND DEFENSE SECTION" (in approximate 14 point font) which contains the following liability insuring agreement language:

A. INSURING AGREEMENT

Subject to all the terms and conditions of this policy, we will pay your legal liability and defense costs up to the **blanket legal liability and defense limit**, or up to the **legal liability and defense sub-limit** for **Covered Legal Liability and Defense Causes of Loss** or from **Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage** that first occurs during the policy period.

(Doc. 19, Ex. D at GFC 94.)[1]

## 3. Legal Liability and Defense Sub-Limit Section

The sub-limit referred to in the preceding insuring agreement language, which GFC argues applies to Mendez, is found on the same page, further down in section E, which is titled "LEGAL LIABILITY AND DEFENSE WITHIN POLICY LIMITS." (Doc. 19, Ex. D at GFC 94.)  As number 2 listed within section E, the "LEGAL LIABILITY AND DEFENSE SUB-LIMIT" reads:

2. **LEGAL LIABILITY AND DEFENSE SUB-LIMIT**: Certain causes of loss, consequential loss or damages are sub-limited and have a lower limit than the **blanket legal liability and defense limit**. These lower limits are stated in the Policy Declarations and Schedules and are defined in **Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage.** Losses paid under this coverage part will reduce the available **blanket legal liability and defense limit** and do not represent additional limits of coverage.

---

[1] The typeface replicated here is exactly as it appears in the policy with respect to bolding, capitalization and italics but not font size.

**(Doc. 19, Ex. D at GFC 94.)[2]**

**The lower limits discussed in the section above are referenced on page 30 of the Policy and Declarations Schedule, which then does not list the lower limits but refers the reader back to pages 43 and 44 of the policy booklet for "definition and limitation" for "Vehicle Liability-Undeclared Drivers." (Doc. 19, Ex. D at GFC 30.)   The section detailing the lower limits for permissive users of scheduled vehicles under the policy are then found at page 43 of the policy booklet, which is also page 105 in the packet of policy materials:**

33. *VEHICLE LIABILITY - UNDECLARED DRIVERS* means all liability and defense claims arising out of the operation or use of your *vehicles* by undeclared operators or drivers (other than employees). The maximum liability limits available to the undeclared operators or drivers (other than employees) for the accident is as follows according to the type of *vehicles* involved:

a. Automobiles, pick-ups, motorcycles, and trucks not subject to Federal Department of Transportation motor carrier regulations; are limited to the statutorily required minimum coverage amount as defined by the automobile financial responsibility laws of the state where the accident occurs;

b. Trucks subject to Federal Department of Transportation motor carrier regulations are limited to the statutorily required minimum coverage amount as defined in Part 387 of the Federal Department of Transportation motor carrier regulations;

c. Snowmobiles, all terrain vehicles (ATV), golf carts, forklifts, trailers, and other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a *building* or *dwelling* are limited to $50,000 per accident.

---

[2]  The typeface replicated here is exactly as it appears in the policy with respect to bolding, capitalization and italics but not font size.

These **vehicle liability-undeclared drivers** coverage limitations apply regardless of whether you have selected a higher liability limit than the limitations listed above.

**Vehicles** mean automobiles, motorcycles, trucks, trailers, forklifts, snowmobiles, all terrain vehicles (ATV), and golf carts. **Vehicles** also include other mobile equipment such as construction or farm machinery that is not permanently installed, attached or in service to a **building** or **dwelling**.

**(Doc. 19, Ex. D at GFC 105.)[3]**

### III. <u>STANDARD OF REVIEW</u>

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id.* A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986). The evidence must be viewed in a light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products,*

---

[3] The typeface replicated here is exactly as it appears in the policy with respect to bolding, capitalization and italics but not font size.

10

*Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL
1490998 (9th Cir. 2001).  Facts are "material" if they "might
affect the outcome of the suit under the governing law."
*Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S.
at 248).

The moving party bears the initial burden of demonstrating
the absence of a genuine issue of fact.  *Devereaux v. Abbey*, 263
F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to
meet this burden, "the nonmoving party has no obligation to
produce anything, even if the nonmoving party would have the
ultimate burden of persuasion at trial."  *Nissan Fire & Marine
Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th
Cir. 2000).  However, if the nonmoving party has the burden of
proof at trial, the moving party must only show "that there is an
absence of evidence to support the nonmoving party's case."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the
moving party has met its burden of proof, the non-moving party
must produce evidence on which a reasonable trier of fact could
find in its favor viewing the record as a whole in light of the
evidentiary burden the law places on that party.  *Triton Energy
Corp.*, 68 F.3d at 1221.  The nonmoving party cannot simply rest
on its allegations without any significant probative evidence
tending to support the complaint.  *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the
> entry of summary judgment, after adequate time
> for discovery and upon motion, against a party
> who fails to make a showing sufficient to
> establish the existence of an element essential
> to the party's case, and on which that party
> will bear the burden of proof at trial.  In such
> a situation, there can be "no genuine issue as
> to any material fact," since a complete failure

11

1              of proof concerning an essential element of the
               nonmoving party's case necessarily renders all
2              other facts immaterial.

3    *Celotex Corp.*, 477 U.S. at 322-23.

4         "In order to show that a genuine issue of material fact

5    exists, the nonmoving party must introduce some 'significant

6    probative evidence tending to support the complaint.'"  *Rivera v.*

7    *AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty*

8    *Lobby, Inc.*, 477 U.S. at 249).  If the moving party can meet his

9    burden of production, the non-moving party "must produce evidence

10   in response....[H]e cannot defeat summary judgment with

11   allegations in the complaint, or with unsupported conjecture or

12   conclusory statements."  *Hernandez v. Spacelabs Med., Inc.*, 343

13   F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations

14   unsupported by factual data cannot defeat summary judgment."

15   *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley*

16   *Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

17

18                          IV. <u>DISCUSSION</u>

19

20   A.   <u>GFC'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO CALIFORNIA
          INSURANCE CODE § 11580.9(b)</u>

21

22        Defendant GFC moves for summary judgment on grounds that,

23   under California Insurance Code section 11580.9(b), GFC's

24   coverage is excess to Great West's coverage because OHK rented or

25   leased a motor vehicle without operator to Mendez and section

26   11580.9(b) conclusively presumes that a policy covering such a

27   renter or lessor is excess over any other insurance applicable to

28   the same loss.  (Doc. 38.)  Plaintiff Great West opposes,

                                   12

contending that section 11580.9(b) is inapplicable because OHK neither leased nor rented its trailer to Mendez or, at minimum, a triable issue of fact remains as to whether a lease or rental existed.

Since the accident, section 11580.9(b) has been amended.  At the time of the accident on December 17, 2004, the prior version of section 11580.9(b) provided:

> Where two or more policies apply to the same loss, and one policy affords coverage to a named insured *in the business of renting or leasing motor vehicles without operators*, it shall be conclusively presumed that the insurance afforded by that policy to a person other than the named insured or his or her agent or employee, shall be excess over and not concurrent with, any other valid and collectible insurance applicable to the same loss covering the person as a named insured as an additional insured under a policy with limits at least equal to the financial responsibility requirements specified in Section 16056 of the Vehicle Code.  The presumption provided by this subdivision shall apply only if, at the time of the loss, the involved motor vehicle either:
>
> (1) Qualifies as a "commercial vehicle" as that term is used in the Section 260 of the Vehicle Code;
>
> (2) Has been leased for a term of six months or longer. (Emphasis added.)

In August 2006, the California Legislature amended section 11580.9(b), effective January 1, 2007, to read:

> Where two or more policies apply to the same loss, and one policy affords coverage to a named insured *who in the course of his or her business rents or leases motor vehicles without operators*, it shall be conclusively presumed that the insurance afforded by that policy to a person other than the named insured or his or her agent or employee, shall be excess over and not concurrent with, any other valid and collectible insurance applicable to the same loss covering the person as a named insured or as an additional insured .

13

. . (Emphasis added.)

Prior to the amendment, there was a split of authority in California appellate courts as to how to determine whether an insured is "engaged in the business of renting or leasing motor vehicles without operators" under section 11580.9(b). As the Ninth Circuit noted in certifying the question to the California Supreme Court on the interpretation of section 11580.9(b), California's second appellate district looked at the insured's primary business purpose to determine whether or not it is "engaged in the business of" leasing motor vehicles while the first and fifth appellate districts examined the specific transaction at issue. *Sentry Select Insurance Co. v. Fidelity & Guaranty*, 455 F.3d 956, 957 (9th Cir. 2006).

Citing *Progressive Casualty Insurance Co. v. Peerless Insurance Co.*, 2007 WL763229 (E.D. Cal. 2007), GFC contends that amended section 11580.9(b) applies retroactively to the loss at issue because the amendment was a clarification of the statute's prior wording. "A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its amendment." *Carter v. Calif. Dept. Of Veterans Affairs*, 38 Cal.4th 914, 922 (2006). But a statute may not apply retroactively if "it substantially changes the legal consequences of past actions, or upsets expectations based in prior law." *Carter*, 38 Cal.4th at 922.

In concluding that "the Legislature recognized a split in judicial interpretation, not a substantive law change, and clarified the correct interpretation" through its amendment of

14

section 11580.9(b), the *Progressive* court pointed to legislative history indicating an intent to clarify the language of the code section.  Specifically, the Assembly Committee on Insurance report stated the amendment was "necessary to avoid uncertainty and unnecessary litigation in these cases, and to restore legislative intent after several conflicting court decisions." Assembly Committee on Insurance, Analysis of Assembly Bill No. 1909 (2005-2006 Reg. Sess.), as introduced January 26, 2006. Further, the Assembly Committee on Insurance issued a summary statement on the amendment, explaining that it "[c]larifies that a policy covering an insured who in the course of his of her business rents or leases motor vehicles for either commercial purposes or for at least a six-month term is considered excess to other insurance policies covering the same loss."  *Id*.

The *Progressive* court analyzed the legislative history and found that the California Legislature intended to clarify section 11580.9(b) through its amendment, not to change existing law. Amended section 11580.9(b) applies retroactively because it is a clarification that does not "substantially [change] the legal consequences of past actions, or [upset] expectations based in prior law."  *Carter*, 38 Cal.4th at 922.

**Applicability of Section 11580.9(b)**

GFC argues section 11580.9(b) establishes its policy as excess because the arrangement between Mendez and OHK is properly characterized as a "rent" or "lease" within the meaning of the section.  It is undisputed that the trailer supplied by OHK is a "motor vehicle without operators" as provided in section 11580.9(b).  It is also undisputed that the trailer is a

15

commercial vehicle within the meaning of California Vehicle Code § 260, was used in Mendez's business, and was leased for six months or more.

Neither the term "rent" or "lease" is defined in section 11508.9.  Under California law, the terms must be interpreted using their "plain and common sense meaning." *MacIsaac v. Waste Management Collection and Recycling, Inc.*, 134 Cal.App.4th 1076, 1083 (2005).  GFC offers the following definitions of the terms from Webster's New World College Dictionary, 4th Edition (2005):

> Lease: A contract by which one party (landlord, or lessor) gives to another (tenant, or lessee) the use and possession of lands, buildings, property, etc. for a specified time and for fixed payments.
>
> Rent: To get the temporary use of (a car, tool, furniture, etc.) by paying a fee.

GFC contends the undisputed facts demonstrate that OHK is in the business of renting or leasing its trailers within the meaning of section 11580.9(b).  It argues that under the subhaul agreement between OHK and Mendez, Mendez as subhauler contracted to pull OHK-owned trailers using his own tractor.  As such, Mendez contracted to act as the operator of the tractor-trailer and was given temporary possession of the OHK trailer for the duration of the subhaul relationship.  GFC further maintains that, under the terms of the subhaul agreement, Mendez paid 25 percent of the amount he received for a particular haul to OHK as a form of "rent" for the use of the trailer.

Plaintiff Great West counters that the facts demonstrate that the Mendez-OHK arrangement does not qualify as a lease or

16

rental, or at minimum, the facts are in dispute.  Plaintiff also offers a statutory definition of "hiring" which is analogous to leasing or renting personal property from California Civil Code § 1925:

> Hiring is a contract by which one gives to another the temporary possession and use of property, other than money, for reward, and the latter agrees to return the same to the former at a future time.

In *Entremont v. Whitsell*, 13 Cal.2d 290 (1939), the California Supreme Court interpreted the meaning of section 1925: "The chief characteristic of a renting or a leasing is the giving up of possession to the hirer, so that the hirer and not the owner uses and controls the rented property."  *See also Rice Brothers, Inc. v. Glens Falls Indemnity Co.*, 121 Cal.App.2d 206 (1953).

Great West argues that even if Mendez had possession of the OHK trailer, which it argues was limited, Mendez was not vested with control of the trailer.  First, Great West points out that the subhaul agreement does not address the providing of OHK's trailer to Mendez but does address that Mendez will provide his own tractor.  The agreement does not describe the arrangement in terms of a hiring, rental or lease.  On the issue of control, Great West asserts that while Mendez was assigned a specific trailer from the OHK fleet, he was required to use other trailers at OHK's discretion when the assigned trailer was out of service for repair or other reasons.  Further, Mendez was only allowed to use the OHK trailer for transportation of product at OHK's direction and OHK exclusively dictated pickup and delivery points of these shipments.  Mendez was prohibited from using the OHK trailer to haul any other loads and was required to operate the

1  tractor that pulled the OHK trailer himself.  Mendez was not

2  allowed to affix any signage to the OHK trailer.  When he was on

3  vacation or otherwise unavailable to haul for OHK, Mendez was

4  expected to relinquish his assigned trailer to OHK for that

5  period.  Finally, after the accident, OHK retook possession of

6  the trailer without notice to Mendez and without requesting or

7  obtaining his consent.

8      Great West further argues that Mendez did not pay rent or

9  otherwise compensate OHK for use of the trailer.  It argues that

10  Mendez was required to forfeit 25 percent of the payment for each

11  haul for use of the required OHK trailer, which was arranged as

12  an offset in the subhaul agreement.  Thus, Great West argues

13  Mendez never made any payment to OHK but merely received his

14  compensation structured as 75 percent of the amount listed in an

15  attachment to the subhaul agreement.  This is sophistry.  Mendez

16  paid 25 percent of his hauling fees to OHK to use its trailer

17      GFC disputes Great West's application of *Entremont*, arguing

18  that the limitations OHK imposed on Mendez's use of the trailer

19  do not alter the nature of the arrangement as a lease or rental.

20  Specifically, GFC argues that Great West's position requires the

21  lessor be "given full flexibility as to the use of the rented

22  property."  (Doc. 47 at 4.)  GFC asserts that "[i]t is a matter

23  of common knowledge that [lessors] of property, whether it be

24  real property or cars, often place parameters as to the

25  [lessee's] use of the property."  (*Id.* at 5.)

26      This argument fails to address the *Entremont* court's

27  explanation that "giving up of possession to the hirer" requires

28  "that the hirer not the owner *uses and controls* the rented

property."  13 Cal.2d at 295(emphasis added.) Great West lists a number of facts that tend to show that OHK was heavily involved in controlling the use of the OHK trailers.  GFC does not dispute these facts or provide additional facts that would demonstrate that it was Mendez who exercised control over the OHK trailer. Moreover, GFC cites no caselaw that would support its position that OHK's direction of Mendez's use of the trailer is simply a common parameter placed on the lessee's use of the property that does not constitute "control" of the property by the owner in the manner described in *Entremont*.

Because the nature of Mendez's use of OHK's trailer is factually and legally disputed, it cannot be determined as a matter of law that the agreement was a lease.  GFC's motion for summary judgment pursuant to California Insurance Code § 11580.9 is DENIED.

**B.**  **CROSS-MOTIONS FOR SUMMARY JUDGMENT: PLAINTIFF SEEKS A DECLARATION THAT THE GFC POLICY LIMIT AS APPLIED TO MENDEZ IS $15 MILLION; DEFENDANT SEEKS A DECLARATION THAT THE GFC POLICY LIMIT AS TO MENDEZ IS $50,000**

Plaintiff Great West moves for summary judgment on its claims for declaratory relief and equitable contribution.  (Doc. 14.)  It seeks a declaration that the coverage limits of the GFC policy as to Mendez are $15 million, inclusive of defense costs. Plaintiff also seeks judgment in its favor on its equitable contribution claim, requesting a judicial determination that Great West is entitled to reimbursement of the approximate $1 million in defense and indemnity costs it incurred and paid on behalf of Mendez in defending and settling claims against him in

the underlying action and a declaration that it owes no further
indemnity or contribution to GFC.

Defendant GFC moves for summary judgment on the grounds that
Mendez was an undeclared driver under the GFC policy and that the
policy contains a $50,000 sub-limit for undeclared drivers.
(Doc. 15.)  It seeks a declaration that, as applied to Mendez,
the GFC policy provides coverage in the amount of this $50,000
sub-limit.

Plaintiff Great West contends that GFC's attempt to limit
coverage to Mendez fails to meet the "conspicuous, plain and
clear" standard under California law that applies to provisions
in insurance policies that attempt to reduce coverage.  As such,
Plaintiff argues the coverage limit as applied to Mendez is $15
million and that, according to rules of contribution, it should
recover much of the amount it paid on behalf of Mendez.

Defendant argues the policy language covering undeclared
drivers that allows for a coverage limit of $50,000 is
conspicuous within the GFC policy.  It further argue the language
is plain and clear and, as such, is enforceable.

### 1. General Principles of California Insurance Law Regarding Policy Interpretation

Under California law, an insurance company must defend its
insured against a suit that seeks damages potentially within the
coverage of its policy.  *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263,
275 (1966); *Montrose Chem. Corp. v. Superior Court,* 6 Cal. 4th
287, 295 (1993).  In determining whether a duty to defend is
owed, the insurer must look to the facts of the complaint and

extrinsic evidence, if available, to determine whether there is a potential for coverage. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 19 (1995). Where extrinsic facts show there is no potential for coverage, the insurer has no duty to defend the action as a matter of law. *Reagan's Vacuum Truck Service Inc. v. Beaver Ins. Co.*, 31 Cal. App. 4th 375, 384 (1994). To establish it has no duty to defend, a carrier is entitled to rely not only on the facts alleged in the complaint, but also extrinsic facts it learns which establish the absence of coverage. *Montrose Chem.*, 6 Cal. 4th at 296-297, 300-301.

> [W]here the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations of the complaint suggest potential liability.

*Waller*, 11 Cal. 4th at 19.

In California, the interpretation of an insurance policy follows a well-established set of rules. As a general matter, "the mutual intention of the parties at the time the contract is formed governs [contract] interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647-48 (2003)(citing Cal. Civ. Code, § 1636). To discern the mutual intent of the parties, a court should apply the following rules, in sequence. *See generally, Croskey, et al., Cal. Prac. Guide: Insurance Litigation*, Ch. 4-A (The Rutter Group 2005).

**Rule 1: The Plain Meaning**. If possible, the mutual intent of the parties is to be "inferred...solely from the written provisions of the contract." *MacKinnon,* 31 Cal. 4th at 647 (citing Cal. Civ. Code § 1638). If an examination of contractual language reveals a "clear and explicit" meaning, this meaning

controls.  *Id*. at 647.  A court must interpret contractual language in its "ordinary and popular sense," unless terms are "used by the parties in a technical sense or a special meaning is given to them by usage."  *Id*. (citing Cal. Civ. Code § 1638; 1644).  A court must, "attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the [] language."  *Id.*

A policy provision will be considered ambiguous, and therefore without a "clear and explicit meaning," when it is "capable of two or more constructions, both of which are reasonable."  *Id*.  But, "language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id.; Waller v. Truck Ins. Exch. Inc.*, 11 Cal. 4th 1, 19 (1995).  The lack of a policy definition does not necessarily render a term ambiguous. *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998). It is appropriate to consider extrinsic evidence for the purpose of determining whether an ambiguity exists, *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d. 33, 37 (1968), or to show that the parties attached a special meaning to certain terms, *ACL Tech., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1794 (1993).

**Rule 2: The Insured's Objectively Reasonable Expectations.** If a provision has no "clear and explicit meaning," ambiguity is "resolved by interpreting the ambiguous provisions in the sense the insurer believed the insured understood them at the time of formation."  *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004).

1          **Rule 3: The Contra-Insurer Rule**.  If application of the
2     first two rules still does not eliminate the ambiguity,
3     "ambiguous language is construed against the party who caused the
4     uncertainty to exist." *E.M.M.I.*, 32 Cal. 4th at 470.  This third
5     "contra-insurer rule" as applied to an insurance policy,
6     "protects not the subjective beliefs of the insurer but, rather,
7     the objectively reasonable expectations of the insured." *Id*. at
8     470-71.  At this stage, "any ambiguous terms are resolved in the
9     insured's favor, consistent with the insured's reasonable
10    expectations." *Id*. at 471.
11         **Rule 4: Exclusions Must be Conspicuous, Plain and Clear**
12         The law requires that an exclusionary clause in an insurance
13    policy be conspicuous, plain and clear.  *E.M.M.I. v. Zurich Amer.*
14    *Ins. Co.*, 84 P.3d 385, 471 (2004); *MacKinnon v. Truck Ins. Co.*,
15    73 P.3d 1205, 1213 (2003).  This is especially true when the
16    coverage portion of the policy would lead an insured to
17    "reasonably expect coverage" for the claim purportedly excluded.
18    *MacKinnon*, 73 P.3d at 1213; *E.M.M.I.*, 84 P.3d at 471.  Further,
19    the burden rests upon the insurer to phrase such provisions in
20    "clear and unmistakable language." *Id.*
21
22         **2. Is the Permissive User Limitation Conspicuous?**
23         Great West contends that the permissive user limitation in
24    the GFC policy is not conspicuous, arguing "buried at the bottom
25    of the one-hundred-and-fifth page of its 120-page policy package,
26    is small-print, inconspicuous and opaque language...." (Doc. 14
27    at 3.)  Great West points to both the length of the policy and
28    the placement of the permissive user limitation for support,

asserting "[t]he supposed coverage restriction is literally over one-hundred densely written (in 9-point print) pages away from the place on the face of the policy where the $15 million coverage promise is so prominently made; the restriction is tucked in after provisions that are guaranteed to lull a reader into torpor." (*Id.* at 4.)  Great West argues that similar efforts to restrict permissive users' coverage have not succeeded, pointing to *Thompson v. Mercury Casualty Co.*, 84 Cal.App.4th 90 (2000), and *Jauregui v. Mid-Century Insurance Co.*, 1 Cal.App.4th 1544 (1991).

In *Thompson*, the California Court of Appeal held that a limitation on liability for "permissive users" of the insured's automobile was inconspicuous because it did not appear in the "Liability" section of the policy, "where an average layperson would expect to find it."  *Thompson*, 84 Cal.App.4th at 97.  There permissive users were included in the definition of insured persons on page one of the six page policy and the limitation was obliquely referred to on the first page as "Condition 23," which was explained later on the policy's last page.  *Id.*  On this page, "Condition 23" was listed in a miscellaneous section that contained 30 random and unrelated subsections.  *Id.*  It was "not **bolded**, *italicized*, enlarged, underlined, in different font, CAPITALIZED, boxed, set apart, or in any other way distinguished from the rest of the fine print."  *Id.*

The *Jauregui* court found a permissive user limitation inconspicuous where the definition of an insured on the first page of the policy included permissive drivers but language limiting permissive user coverage was found in the "Other

Insurance" section on the second page.  *Jauregui*, 1 Cal.App.4th at 1549-50.  There were five sections set forth in bold in the policy, including the "Other Insurance" section and sections entitled "Exclusions" and "Limits on Liability."  *Id*.  Ruling that the insurer did not meet its obligations "by hiding the disfavored language in an inconspicuous portion of the policy," the court held:

> The coverage limitation for permissive drivers is not contained within one of the subheadings that might alert the reader to a partial exclusion.  Rather it appears within a subsection whose ordinary language would not encompass the limitation and is surrounded by language that has nothing to do with exclusions or limitations on coverage.

*Jauregui*, 1 Cal.App.4th at 1549-50.

In *Haynes v. Farmers Ins. Exchange*, 32 Cal.4th 381 (2004), the California Supreme Court found two limitations on liability for permissive users in the same policy inconspicuous, one in the main policy and one in an endorsement.  There the first page of the policy, the declarations page, listed dollar amounts for coverage limits and, two-thirds of the way down the page, a box was displayed that contained "endorsement numbers," including one listed as "S9064."  *Id*. at 384.  No explanation or definition of "endorsement" was given and no information was provided as to the location or subject matter of any of the endorsements.  *Id*.  On page 7, the definition of an insured person included permissive users.  *Id*.  On page 24, "Endorsement S9064" was listed and described as a permissive user limitation, detailing the specific dollar amounts that applied.  *Id*. at 384-85.

In the main policy, the "Liability" section consisted of 4 subsections: "Coverage," "Exclusions," "Limits of Liability," and

"Other Insurance."  *Id*. at 384.  On page 10 of the policy, under the heading "Other Insurance," language was included that limited permissive user coverage to the minimum limits of the financial responsibility law of the state.  *Id*.  In finding this language inconspicuous, the *Haynes* court noted that the heading "Other Insurance" did not alert a reader to its contents, the permissive user coverage limit.  *Id*. at 386.  Further, nothing in the section attracted attention to the limiting language.  *Id*.

As to the endorsement, *Haynes* first observed that nothing on the declarations page alerted a reader to the content of endorsement S9064, nor was there any reference to coverage limits for permissive users consisting of amounts less than the specific dollar amounts displayed on the first page.  *Id*. at 387.  Next it noted that within the endorsement, the limiting language was "'not bolded, italicized, enlarged, underlined, in different font, capitalized, boxed, set apart, or in any other way distinguished from the rest of the fine print.'" *Id*. (citing Thompson, 84 Cal.App.4th at 97).  Moreover, the definition of the insured still "'gives every indication that a permissive driver stands in the same position as the insured and receives the same coverage'" and the language "in endorsement S9064 remains 'surrounded by language that has nothing to do with exclusions or limitations on coverage.'"  *Id*. at 388 (citing *Jauregui*, 1 Cal.App.4th at 1549-50).

a) <u>Extension of Coverage to Permissive Users</u>

As in *Thompson*, *Jauregui*, and *Haynes*, the GFC policy lists permissive users on the same page where the insured is defined, without any language specifying that coverage limits for such

users are different than those for other insured persons.  Ex. D,
GFC 63.  The three cited cases are otherwise distinguishable.  In
the GFC policy, permissive users are distinctly defined as
"additional insureds" in a later section following where "the
insured" are defined at the top half of the page.  *Id*.  The words
"[t]he following are insureds under this policy" appear at the
top of page GFC 63 under the capitalized heading "THE INSURED"
before a list that includes named persons in the policy
declarations and schedules and their family, legal
representative, employees and others.  In a separate section
headed "ADDITIONAL INSUREDS" at the bottom of the same page,
permissive users are included as additional insureds: "The
following are ADDITIONAL INSUREDS: A. Any person operating your
vehicles or watercraft with your permission , but only with
respect to their operation of covered vehicles or watercraft."
Thus, although perhaps a minor difference with the California
cases discussed above, coverage is extended under the GFC policy
to permissive users specifically as "additional insureds" in a
different section and paragraph from where the original insureds
are set forth.

    **b)** <u>Notice of the Existence of Coverage Limitation</u>

  More significant differences exist.  At the outset, on the
first page of the policy booklet, the insured is notified that
the policy is composed of five sections, including one entitled
"Legal Liability and Defense," and is directed to pay special
attention to "[w]ords or phrases in *bold face italic script*."

Ex. D, GFC 60.[4]  **This page begins with a notice to the insured:** **"Please read this Policy and the Declarations and Schedules** **carefully."**  *Id.*  **The fourth paragraph informs the reader that** **the policy booklet is composed of five sections:** "the Covered Property Section, the Business Income or Extra Expense Section, the Legal Liability and Defense Section, the Uninsured Risks Section, and the Common Section.  Words or phrases in ***bold face*** ***italic script*** are key terms defined in that section.  The meaning of these key terms remains consistent throughout each section." *Id.*

**On the second page of the policy booklet, the concept of a** **liability sub-limit is introduced in the Table of Contents, under** **the section entitled "Legal Liability and Defense" as subsection** **"I. Sub-Limited Legal Liability and Defense Causes of Loss -** **Consequential Loss or Damage," listed as page 35.  Ex. D, GFC 61.** **More specifically, the second and third pages of the policy** **booklet encompass and are entitled "Table of Contents" and set** **forth eight bolded, capitalized, unnumbered section headings in** **the following order: THE INSURER, THE INSURED, ADDITIONAL** **INSUREDS, COVERED PROPERTY, LOSS OF BUSINESS INCOME OR EXTRA** **EXPENSE, LEGAL LIABILITY AND DEFENSE, UNINSURED RISKS, COMMON** **POLICY TERMS AND CONDITIONS.  Ex. D, GFC 61-62.  The sixth bolded**

---

[4] **The 120 page GFC policy consists of two parts: 1) the** **Policy Declarations and Schedules, which is presented in Exhibit** **D as the first 59 pages of the entire policy (GFC 1-59), and 2)** **the policy form or booklet, presented as 61 pages long (GFC 60-** **120), which appears to be a separate document as it contains a** **table of contents, an index, and its own internal numbering of** **pages 1-54 which does not include the table of contents or index.**

heading is "**LEGAL LIABILITY AND DEFENSE**" and this heading appears on the first page of the table of contents.  *Id*. at GFC 61.  It lists nine subsections marked A-I and appears as follows:

<u>LEGAL LIABILITY AND DEFENSE</u>                                                                    <u>32</u>

A.   INSURING AGREEMENT                                                          32

B.   OUR DUTY TO INVESTIGATE, DEFEND AND SETTLE                                  32

C.   LEGAL COUNSEL                                                               32

D.   PRIOR WRITTEN CONSENT REQUIRED                                             32

E.   LEGAL LIABILITY AND DEFENSE WITHIN POLICY LIMITS                           32

F.   YOUR DUTIES IN THE EVENT OF A LEGAL LIABILITY AND DEFENSE LOSS             32

G.   COVERED LEGAL LIABILITY AND DEFENSE COSTS                                  33

H.   COVERED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS                         33

I.   SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS- CONSEQUENTIAL LOSS OR

DAMAGE          35

On the second page of the policy booklet, the contents of the Legal Liability and Defense Section are outlined for the reader, including a subsection on sub-limits, and the corresponding page numbers are explicitly referenced.

The actual "**LEGAL LIABILITY AND DEFENSE SECTION**" begins on what is internally numbered as page 32 in the policy form.  Ex. D, GFC 94.  The first line at the top of the page, which is a heading, reads "**LEGAL LIABILITY AND DEFENSE SECTION**" in font size that is capitalized and bigger than that on the rest of the page. The first two subsections within this section read:

A. INSURING AGREEMENT

Subject to all the terms and conditions of this policy, we will pay your legal liability and defense costs up to the **blanket legal liability and defense limit**, or up to the **legal liability and defense sub-limit** for **Covered Legal Liability and Defense Causes of Loss** or from **Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage** that first occurs during the policy period.

Exposure to substantially the same cause or causes of loss or damage or a series of related acts or omissions shall be considered a single claim.  In the event a claim relates to two or more of our policy periods, such claim shall be deemed to have originated in the earliest policy period in which the loss first occurred.  If that claim is covered, all damages related to that claim shall be included in the applicable **blanket legal liability and defense limit** or **legal liability and defense sub-limit** of the earliest policy period during which the claim first began to occur.

This coverage applies to covered claims that take place anywhere in the world during the policy period.  Please be aware that many foreign countries (including Mexico) do not accept or recognize any coverage (including vehicle liability coverage) issued by an insurance company not domiciled in that country.  We are domiciled in the United States of America.

B. OUR DUTY TO INVESTIGATE, DEFEND AND SETTLE

We have the duty to investigate, defend or settle any covered claim or suit.  Our duty to investigate, defend or settle is completed when we have paid the applicable **blanket legal liability and defense limit** or **legal liability and defense sub-limit** of insurance in investigation, attorney's fees, settlement, defense costs, interest or payment of claims.

**(Doc. 19, Ex. D at GFC 94.)**

**In these first two sub-sections of the "Legal Liability and Defense Section," there are three references to the "legal liability and defense sub-limit" at issue here and all of them are in bolded, italicized type.  While these references do not explain what this sub-limit is, they do describe the "blanket**

30

legal liability and defense limit" and the "legal liability and defense sub-limit" as contrasting alternatives, with section A stating: "we will pay your legal liability and defense costs up to" the blanket limit or the sub-limit.  In section B, the insurer's duty is explained as "completed when we have paid the applicable *blanket legal liability and defense limit* or *legal liability and defense sub-limit,"* also providing the two limits as two different options.

The nature of the sub-limit is explained a few lines later on the same page, in section E2:

> **2.** *LEGAL LIABILITY AND DEFENSE SUB-LIMIT***:** Certain causes of loss, consequential loss or damages are sub-limited and have a lower limit than the *blanket legal liability and defense limit*. These lower limits are stated in the Policy Declarations and Schedules and are defined in *Sub-limited Legal Liability and Defense Causes of Loss - Consequential Loss or Damage.* Losses paid under this coverage part will reduce the available *blanket legal liability and defense limit* and do not represent additional limits of coverage.

(Doc. 19, Ex. D at GFC 94.)

The existence of sub-limits is mentioned upfront in the liability section of the policy, where an insured would go to find details of coverage after having an accident that resulted in a lawsuit.  The language is bolded and italicized to attract a reader's attention and makes clear that the blanket limit is not applicable to all causes of loss.  Taken as a whole, on the first page of the "Legal Liability and Defense Section," the sub-limit is mentioned four times in bold type and a paragraph, subsection E2, is devoted to explaining it.  The paragraph explicitly references "lower limits" than the blanket limit, detailing that some losses "are sub-limited and have a lower limit than the

blanket legal liability and defense limit" in its first sentence. The lower limits are not specified in this section, rather, the reader is put on notice that the lower limits are detailed in two separate places: 1)the Policy Declarations and Schedules, and 2) "Sub-limited Legal Liability and Defense Causes of Loss-Consequential Loss or Damage."

### c) <u>Locating the Coverage Limitation</u>

Accordingly, there are two alternate approaches a reader can take to find the $50,000 undeclared drivers sub-limit that GFC claims applies to Mendez.  First, the reader can begin with the Policy Declarations and Schedules and locate the listing of the sub-limit for "Vehicle Liability-Undeclared Drivers" on page 30 of the declarations.  Ex. D, GFC 30.  To do this, because there is no table of contents to the Policy Declarations and Schedules, from page 1 a reader has to read through the first six pages listing insureds and additional insureds, to reach the "Covered Property Section" on page 7 and the "Loss of Business Income or Extra Expense Section" on page 19 - because these sections do not relate to the type of loss incurred - to reach the "Legal Liability and Defense Section" on page 22.  Ex. D, GFC 1-22.  The first seven pages of the "Legal Liability and Defense Section" consists of listings of declared vehicles and drivers.  *Id.* at GFC 22-28.  A reader who is a permissive user would, after reading through these 7 pages, discover that a permissive user is not included on the list of declared drivers.

The reader has reached the heading of "SUB-LIMITED LEGAL LIABILITY AND DEFENSE CAUSES OF LOSS - CONSEQUENTIAL LOSS OR DAMAGE" at the top of page 29, which is bolded, capitalized and

highlighted between two lines.  **Ex. D, GFC 29.**  Listed in

alphabetical order, the reader can review one and a half pages to

reach the bottom of page 30 to find "Vehicle Liability -

Undeclared Drivers."  *Id*. at GFC 30.  Here the reader is referred

to the pages in the policy booklet which list the undeclared

driver limits by the following statement in parentheses: "See

pages 43 and 44 of the policy form for definition and

limitation."  Turning to these pages in the policy booklet, the

reader encounters a section numbered 33 dealing with undeclared

drivers:

> **33.** *VEHICLE LIABILITY - UNDECLARED DRIVERS* **means** all
> liability and defense claims arising out of the operation or
> use of your ***vehicles*** by undeclared operators or drivers
> (other than employees). The maximum liability limits
> available to the undeclared operators or drivers (other than
> employees) for the accident is as follows according to the
> type of ***vehicles*** involved:
>
>     a. Automobiles, pick-ups, motorcycles, and trucks not
> subject to Federal Department of Transportation motor
> carrier regulations; are limited to the statutorily required
> minimum coverage amount as defined by the automobile
> financial responsibility laws of the state where the
> accident occurs;
>
>     b. Trucks subject to Federal Department of
> Transportation motor carrier regulations are limited to the
> statutorily required minimum coverage amount as defined in
> Part 387 of the Federal Department of Transportation motor
> carrier regulations;
>
>     c. Snowmobiles, all terrain vehicles (ATV), golf carts,
> forklifts, trailers, and other mobile equipment such as
> construction or farm machinery that is not permanently
> installed, attached or in service to a ***building*** or ***dwelling***
> are limited to $50,000 per accident.
>
> These ***vehicle liability-undeclared drivers*** coverage
> limitations apply regardless of whether you have selected a
> higher liability limit than the limitations listed above.
>
> ***Vehicles*** mean automobiles, motorcycles, trucks, trailers,
> forklifts, snowmobiles, all terrain vehicles (ATV), and golf
> carts. ***Vehicles*** also include other mobile equipment such as
> construction or farm machinery that is not permanently

33

installed, attached or in service to a *building* or *dwelling*.

GFC argues section 33(c) as it appears in the policy applies to Mendez because he was hauling a "trailer" that is "limited to $50,000 per accident."

The alternative route to reach the sub-limit section is to look for "Sub-limited Legal Liability and Defense Causes of Loss-Consequential Loss or Damage." This listing is found in the table of contents of the policy booklet, which refers the reader to page 35, subsection I. Ex. D, GFC 61. It is also separately listed in the index of the policy booklet. *Id*. at 120. Page 35 sets forth a list of definitions of sub-limits for 37 different causes of loss, numbered as 1-37 under section I and spanning 10 pages. *Id*. at GFC 97-108. The sub-limit GFC claims applies to Mendez is listed on page 43 as number 33, "Vehicle Liability - Undeclared Drivers." *Id*. at GFC 105. This requires a reader to thumb though 8 pages, from page 35 to 43 of the policy booklet, to find the relevant sub-limit.

A third way to find the undeclared drivers sub-limit is by referencing the policy booklet index. If a reader understood he was an undeclared driver, the reader finds the provision by looking under "V" in the index, where "Vehicle Liability - Undeclared Drivers" is listed and page 43 is cited as the location of this provision. Ex. D, GFC 120.

Whichever method a reader uses to find the "Vehicle Liability - Undeclared Drivers" provision on page 43, the provision is clearly highlighted to make it conspicuous. The heading "VEHICLE LIABILITY - UNDECLARED DRIVERS" is capitalized, numbered (as number 33), bolded, and italicized to distinguish it

from the rest of the print on the page.  This heading and the language of the provision itself are in type that is the same size as the print on the rest of the page.  This provision is located in a section, "Sub-limited Legal Liability and Defense Causes of Loss- Consequential Loss or Damage," that is named to reflect its content and is highlighted through capitalization, bold font, and lines drawn above and below the title of the section that emphasize it as a heading.  *See National Ins. Underwriters v. Carter,* 17 Cal.3d 380, 385 (1976) (exclusion was conspicuous when located in section of policy under boldface heading, "EXCLUSIONS," notwithstanding print was of the same size and density as the rest of the policy).

Unlike in *Thompson*, this disputed provision is located in the section of the policy "where an average layperson would expect to find it" – the Legal Liability and Defense Section, and within that, the subsection on sub-limits.  *Thompson*, 84 Cal.App.4th at 97.  Similarly, the limitation here is distinguished from *Jauregui* because it is contained within a sub-heading that alerts the reader to an exclusion and is not "surrounded by language that has nothing to do with exclusions or limitations on coverage."  1 Cal.App.4th at 1549-50.

The way the limiting language is designed to attract the reader's attention is entirely different from the language found inconspicuous in *Thompson* and *Haynes*, where none of the language at issue was "bolded, italicized, enlarged ...capitalized" or otherwise set apart from the print on the rest of the page. *Thompson*, 84 Cal.App.4th at 97; *Haynes*, 32 Cal.4th at 387.

This conclusion is reinforced by the fact that Plaintiff declares the extension of coverage to permissive users in the

"additional insured" section on the first page of the policy booklet "relatively accessible and easy-to-read" and also states coverage for permissive users "is explicitly and prominently promised." (Doc. 14 at 4, 7.)  Interestingly, the print used for the undeclared driver limitation on page 43 of the same booklet is the exact same size and font type as the section extending coverage to permissive users.  Compare Ex. D at GFC 63 to Ex. D at GFC 105.  All this contradicts Plaintiff's argument that the coverage limitation is inconspicuous.

### 3. Is the Limitation Plain and Clear?

A coverage limitation is plain and clear when, from the perspective of an average layperson, it is communicated in clear and understandable language.  *MacKinnon*, 31 Cal.4th at 649; *Nat'l Auto & Cas. Ins. Co. v. Stewart*, 223 Cal.App.3d 452, 457 (1990).

Great West contends that the language of the limitation is unclear, claiming "undeclared driver" is defined nowhere in the policy nor is it listed in the policy's index.  This contention is inaccurate as the "Vehicle Liability - Undeclared Drivers" provision is located under "V" in the index.  Plaintiff argues that Mendez's tractor is not a "trailer" within the meaning of section c of the "33. Vehicle Liability - Undeclared Drivers" section.

An examination of the "33. Vehicle Liability - Undeclared Drivers" provision reveals that the liability limits are listed "according to the type of *vehicles* involved."  Sub-section "a" deals with automobiles, pick-ups, motorcycles and trucks not subject to federal regulations, while sub-section "b" deals with trucks subject to federal regulations.  Sub-section "c" deals

with snowmobiles, ATVs, golf carts, forklifts, trailers and other mobile equipment not permanently attached to a building or dwelling.

The OHK trailer Mendez was hauling is listed as a trailer in the schedule of vehicles in the GFC policy and the sub-haul agreement between OHK and Mendez also references "trailers."  In the undeclared driver limit, "trailer" is among those vehicles listed in section c as "limited to $50,000 per accident."  This is clear and understandable to an average layperson.  Accordingly, the undeclared driver provision is plain and clear.


### 4. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED.  Defendant's motion for summary judgment is GRANTED.

Defendant shall submit a proposed order consistent with the above decision within 5 days of service of this order.


SO ORDERED

Dated: September 30, 2008

                              /s/ Oliver W. Wanger
                              Oliver W. Wanger
                        United States District Judge